### THE ANNEX NO. 5.

#### (District Court, E. D. New York.  July 10, 1902.)

1. COLLISION—SUFFICIENCY OF FOG BELL—ANCHORED SCOW.
     There is no statute nor harbor regulation fixing the size of the fog bell to be used on scows permanently anchored in New York Harbor, but the sufficiency of such bell is to be determined by the rule that reasonable care must be exercised in its selection, having reference to the locality and dangers to be encountered and the vessels to be warned. A bell seven inches in diameter and height, to be rung by hand, *held* insufficient on a scow stationed 850 feet off the piers in East river, in the track of steam vessels of all kinds.

2. SAME—FERRYBOAT AND ANCHORED SCOW—FOG.
     A scow anchored in East river for the purpose of making tunnel borings *held* in fault for a collision with a steam ferryboat in a fog, because of the insufficient 'size of its bell, which could not be heard on the ferryboat until the latter stopped when close to the scow.  The ferryboat also *held* in fault for improper navigation after discovering the position of the scow.

In Admiralty.  Suit for collision.

Bergen & Dykman, for libelant.
Robinson, Biddle & Ward and Mr. Hough, for claimant.

THOMAS, District Judge. The libelant, pursuant to authority from the Rapid Transit Commissioners, authorized by the legislature of the state of New York, and a permit furnished from the secretary of war, placed in the East river a scow 22 feet wide and 50 feet in length for the purpose of making certain borings underneath the river's bed. The scow was located about 850 feet from pier 4, on the New York side, and about 2,000 feet from the foot of Joralemon street, on the Brooklyn side, with her bow straight up the river. She had been in this position for a week, and her locality was well known to the captain of the Annex boat, which came in collision with her. The collision occurred on Sunday. The wind was light from the southwest, and the tide was ebb. There was a light rain and heavy fog, which had been continuing for some hours, the fog lifting slightly at times. At about 5 p. m., Annex Boat No. 5 left her slip below the bridge on the Brooklyn shore, went out upon a northerly course, straightened down the river upon what the captain stated was a southwest course, which, if continued, would have carried him well to the southerly side of Staten Island. However, he testified that, in order to avoid a tow, he went well towards the New York shore, and, after proceeding a few minutes, stopped, to discover the exact location of the scow, and that, after drifting, he suddenly saw her one and a half or two of his own boat's lengths away, and that then for the first time he heard her bell; that thereupon he put his own boat, which was lying across the tide, and pointing for about pier 4 on the New York side, under full speed, and then or shortly afterward starboarded his wheel to throw his stern around, and kept on his way; that the after part of the port side of his boat came in contact with the port corner of the scow, as he judges, although it seems that neither he nor anybody on his vessel knew that there was an actual collision. He stated that when he first saw the scow she bore about two points on his port bow, but the diagram later prepared by him shows that she was about four points on his port bow, and that he was crossing her bow when he discovered her. On the scow were two persons, one of whom was ringing a bell that was about 15 feet above the deck of the scow; and another had been watching from the stern of the vessel, but shortly before the accident came to the point where the bell was. The evidence on the part of the scow is to the general effect that the port side of the Annex boat, somewhat forward of the wheel, struck the starboard corner of the scow, and broke her two forward anchor ropes, so that she went adrift, and did some other injury, for which the libel is filed.

The questions are whether the bell used by the scow was proper, and duly rung, and whether the Annex boat, in the exercise of due care, should have heard it. The bell was about seven inches in diameter and height, the sounding part being some five inches in height. It is claimed that the bell was sufficient under the act of congress of 1897 (chapter 4) entitled "An act to adopt regulations for preventing collision upon certain harbors, rivers and inland waters of the United States," and the part thereof relating to "sound signals for fogs," etc., which provides (article 15):

"In fog, mist, falling snow, * * * the signals described in this article shall be used as follows, viz.: (d) A vessel when at anchor shall at intervals of not more than one minute, ring the bell rapidly for about five seconds."

See similar provisions in chapter 802, Act Aug. 19, 1890.

It is also urged that authority for the use of the bell in question is to be found in the rules and regulations of the board of supervising inspectors, provided at a meeting held February 13, 1897, as follows:

"Such vessels of ten gross tons and under, if provided with a bell of six inches in diameter, of good tone and quality, to be rung by hand in fog or thick weather, shall be deemed to be properly equipped in that respect."

This provision relates to steam vessels. Therefore attention is not called to any applicable statute fixing the size of the bell. Hence reasonable care must be used in its selection, and such care should have reference to the locality and dangers to be encountered and vessels to be warned. The evidence is that the bell was rung from time to time, two persons being engaged for that purpose, and acting alternately. The young man who was ringing the bell at the time of the collision states that he had been ringing it vigorously; and his companion testified that he came forward when the whistle of the Annex was heard, and told his alternate to ring hard, whereupon the latter, holding the tongue in his hand, did strike the bell hard and quickly, and, the steamer's whistle being repeated, the ringing was vigorously continued. At the time of the intensified ringing those on the Annex heard the bell, as did persons upon tugs in the slip of pier 4. These witnesses in the slip were connected with the libelant's undertaking, and favorable to it, and yet it appears from their evidence that the bell, although rung actively just before the accident, and therefore heard, at other times was heard faintly, or not at all, which latter circumstance may have happened from a lack of continued attention. The bell was rung more efficiently shortly before the collision, and the wind was favorable for carrying sound to the Annex. The day was Sunday. There was no other vessel near by, and, if the bell had been sounded with all possible activity, it should have been heard farther away than it was heard by those on the Annex. The bell seems to be about the usual size employed on tugs, but it was altogether too small and incapable to warn vessels of this new and continued menace to navigation in one of the most frequented localities of the East river. To strike the bell quickly and hard was possible, but the labor of doing it could not be long continued, and, when the diminished effort came, the bell would not be heard upon a sidewheel steamer by reason of its own noise. The bell was practically nothing more than a good-sized hand bell, and at the peril of hearing it was placed the safety of a large number of vessels that passed and repassed and crossed and recrossed in its immediate locality. It is not believed that the captain of the Annex could or should have heard the bell earlier than he did, and that was when he was in close and dangerous proximity to the scow.

But the Annex herself was not free from fault. It is believed that she struck the scow on the latter's starboard side. The Annex was

in the wrong place in the river, and when the captain discovered the scow his vessel was heading for pier 4, directly across the bows of the scow. His first evidence shows that he was about two points on the starboard side of the scow. Later he increases the points to four. In any case, he tried to cross her bow and avoid her by starboarding and swinging the ferryboat's stern out of her way. The result was that he ran into her. He was negligent in attempting to go ahead of her in such close quarters. He knew of the scow; had shortly before passed her; knew what kind of a bell she was using; knew how it sounded in the prevailing weather; and, if he could not hear it farther away than he did, he should have kept off, or, in any case, backed away; or, if he was on the starboard side of the scow, as he evidently was, he should have stayed there. The bell was bad. Being bad, it was of necessity badly sounded, and the Annex boat was maneuvered with culpable negligence.

The damages and costs should be divided.